## SKINNER *v.* OKLAHOMA ex rel. WILLIAMSON, ATTORNEY GENERAL.

No. 782. Argued May 6, 1942.—Decided June 1, 1942.

536

*Messrs. W. J. Hulsey, H. I. Aston,* and *Guy L. Andrews* submitted for petitioner.

*Mr. Mac Q. Williamson,* Attorney General of Oklahoma, for respondent.

Mr. Justice Douglas delivered the opinion of the Court.

This case touches a sensitive and important area of human rights. Oklahoma deprives certain individuals of a right which is basic to the perpetuation of a race—the right to have offspring. Oklahoma has decreed the enforcement of its law against petitioner, overruling his claim that it violated the Fourteenth Amendment. Because that decision raised grave and substantial constitutional questions, we granted the petition for certiorari.

The statute involved is Oklahoma's Habitual Criminal Sterilization Act. Okla. Stat. Ann. Tit. 57, §§ 171, *et seq.;* L. 1935, pp. 94 *et seq.* That Act defines an "habitual criminal" as a person who, having been convicted two or more times for crimes "amounting to felonies involving moral turpitude," either in an Oklahoma court or in a court of any other State, is thereafter convicted of such a felony in Oklahoma and is sentenced to a term of imprisonment in an Oklahoma penal institution. § 173. Machinery is provided for the institution by the Attorney General of a proceeding against such a person in the Oklahoma courts for a judgment that such person shall be rendered sexually sterile. §§ 176, 177. Notice, an opportunity to be heard, and the right to a jury trial are provided. §§ 177–181. The issues triable in such a proceeding are narrow and con-

fined. If the court or jury finds that the defendant is an "habitual criminal" and that he "may be rendered sexually sterile without deteriment to his or her general health," then the court "shall render judgment to the effect that said defendant be rendered sexually sterile" (§ 182) by the operation of vasectomy in case of a male, and of salpingectomy in case of a female. § 174. Only one other provision of the Act is material here, and that is § 195, which provides that "offenses arising out of the violation of the prohibitory laws, revenue acts, embezzlement, or political offenses, shall not come or be considered within the terms of this Act."

Petitioner was convicted in 1926 of the crime of stealing chickens, and was sentenced to the Oklahoma State Reformatory. In 1929 he was convicted of the crime of robbery with firearms, and was sentenced to the reformatory. In 1934 he was convicted again of robbery with firearms, and was sentenced to the penitentiary. He was confined there in 1935 when the Act was passed. In 1936 the Attorney General instituted proceedings against him. Petitioner in his answer challenged the Act as unconstitutional by reason of the Fourteenth Amendment. A jury trial was had. The court instructed the jury that the crimes of which petitioner had been convicted were felonies involving moral turpitude, and that the only question for the jury was whether the operation of vasectomy could be performed on petitioner without detriment to his general health. The jury found that it could be. A judgment directing that the operation of vasectomy be performed on petitioner was affirmed by the Supreme Court of Oklahoma by a five to four decision. 189 Okla. 235, 115 P. 2d 123.

Several objections to the constitutionality of the Act have been pressed upon us. It is urged that the Act cannot be sustained as an exercise of the police power, in view

of the state of scientific authorities respecting inheritability of criminal traits.[1] It is argued that due process is lacking because, under this Act, unlike the Act [2] upheld in *Buck* v. *Bell*, 274 U. S. 200, the defendant is given no opportunity to be heard on the issue as to whether he is the probable potential parent of socially undesirable offspring. See *Davis* v. *Berry*, 216 F. 413; *Williams* v. *Smith*, 190 Ind. 526, 131 N. E. 2. It is also suggested that the Act is penal in character and that the sterilization provided for is cruel and unusual punishment and violative of the Fourteenth Amendment. See *Davis* v. *Berry, supra.* Cf. *State* v. *Feilen,* 70 Wash. 65, 126 P. 75; *Mickle* v. *Henrichs,* 262 F. 687. We pass those points without intimating an opinion on them, for there is a feature of the Act which clearly condemns it. That is, its failure to meet the requirements of the equal protection clause of the Fourteenth Amendment.

We do not stop to point out all of the inequalities in this Act. A few examples will suffice. In Oklahoma, grand larceny is a felony. Okla. Stats. Ann. Tit. 21, §§ 1705, 5. Larceny is grand larceny when the property taken exceeds $20 in value. *Id.* § 1704. Embezzlement is punishable "in the manner prescribed for feloniously stealing property of the value of that embezzled." *Id.* § 1462. Hence, he who embezzles property worth more than $20 is guilty of a felony. A clerk who appropriates over $20 from his employer's till (*id.* § 1456) and a stranger who steals the same

---

[1] Healy, The Individual Delinquent (1915), pp. 188–200; Sutherland, Criminology (1924), pp. 112–118, 621–622; Gillin, Criminology and Penology (1926), c. IX; Popenoe, Sterilization and Criminality, 53 Rep. Am. Bar. Assoc. 575; Myerson et al., Eugenical Sterilization (1936), c. VIII; Landman, Human Sterilization (1932), c. IX; Summary of the Report of the American Neurological Association Committee for the Investigation of Sterilization, 1 Am. Journ. Med. Jur. 253 (1938).

[2] And see *State* v. *Troutman*, 50 Ida. 673, 299 P. 668; Chamberlain, Eugenics in Legislatures and Courts, 15 Am. Bar Assn. Journ. 165; Castle, The Law and Human Sterilization, 53 Rep. Am. Bar Assoc., 556, 572; 2 Bill of Rights Review 54.

amount are thus both guilty of felonies. If the latter repeats his act and is convicted three times, he may be sterilized. But the clerk is not subject to the pains and penalties of the Act no matter how large his embezzlements nor how frequent his convictions. A person who enters a chicken coop and steals chickens commits a felony (*id.* § 1719); and he may be sterilized if he is thrice convicted. If, however, he is a bailee of the property and fraudulently appropriates it, he is an embezzler. *Id.* § 1455. Hence, no matter how habitual his proclivities for embezzlement are and no matter how often his conviction, he may not be sterilized. Thus, the nature of the two crimes is intrinsically the same and they are punishable in the same manner. Furthermore, the line between them follows close distinctions—distinctions comparable to those highly technical ones which shaped the common law as to "trespass" or "taking." Bishop, Criminal Law (9th ed.) Vol. 2, §§ 760, 799, *et seq.* There may be larceny by fraud rather than embezzlement even where the owner of the personal property delivers it to the defendant, if the latter has at that time "a fraudulent intention to make use of the possession as a means of converting such property to his own use, and does so convert it." *Bivens* v. *State,* 6 Okla. Cr. 521, 529, 120 P. 1033, 1036. If the fraudulent intent occurs later and the defendant converts the property, he is guilty of embezzlement. *Bivens* v. *State, supra; Flohr* v. *Territory,* 14 Okla. 477, 78 P. 565. Whether a particular act is larceny by fraud or embezzlement thus turns not on the intrinsic quality of the act but on when the felonious intent arose— a question for the jury under appropriate instructions. *Bivens* v. *State, supra; Riley* v. *State,* 64 Okla. Cr. 183, 78 P. 2d 712.

It was stated in *Buck* v. *Bell, supra,* that the claim that state legislation violates the equal protection clause of the Fourteenth Amendment is "the usual last resort of constitutional arguments." 274 U. S. p. 208. Under our con-

stitutional system the States in determining the reach and scope of particular legislation need not provide "abstract symmetry." *Patsone* v. *Pennsylvania*, 232 U. S. 138, 144. They may mark and set apart the classes and types of problems according to the needs and as dictated or suggested by experience. See *Bryant* v. *Zimmerman*, 278 U. S. 63, and cases cited. It was in that connection that Mr. Justice Holmes, speaking for the Court in *Bain Peanut Co.* v. *Pinson*, 282 U. S. 499, 501, stated, "We must remember that the machinery of government would not work if it were not allowed a little play in its joints." Only recently we reaffirmed the view that the equal protection clause does not prevent the legislature from recognizing "degrees of evil" (*Truax* v. *Raich*, 239 U. S. 33, 43) by our ruling in *Tigner* v. *Texas,* 310 U. S. 141, 147, that "the Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." And see *Nashville, C. & St. L. Ry.* v. *Browning,* 310 U. S. 362. Thus, if we had here only a question as to a State's classification of crimes, such as embezzlement or larceny, no substantial federal question would be raised. See *Moore* v. *Missouri,* 159 U. S. 673; *Hawker* v. *New York,* 170 U. S. 189; *Finley* v. *California,* 222 U. S. 28; *Patsone* v. *Pennsylvania, supra.* For a State is not constrained in the exercise of its police power to ignore experience which marks a class of offenders or a family of offenses for special treatment. Nor is it prevented by the equal protection clause from confining "its restrictions to those classes of cases where the need is deemed to be clearest." *Miller* v. *Wilson,* 236 U. S. 373, 384. And see *McLean* v. *Arkansas,* 211 U. S. 539. As stated in *Buck* v. *Bell, supra,* p. 208, ". . . the law does all that is needed when it does all that it can, indicates a policy, applies it to all within the lines, and seeks to bring within the lines all similarly situated so far and so fast as its means allow."

But the instant legislation runs afoul of the equal protection clause, though we give Oklahoma that large deference which the rule of the foregoing cases requires. We are dealing here with legislation which involves one of the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race. The power to sterilize, if exercised, may have subtle, far-reaching and devastating effects. In evil or reckless hands it can cause races or types which are inimical to the dominant group to wither and disappear. There is no redemption for the individual whom the law touches. Any experiment which the State conducts is to his irreparable injury. He is forever deprived of a basic liberty. We mention these matters not to reëxamine the scope of the police power of the States. We advert to them merely in emphasis of our view that strict scrutiny of the classification which a State makes in a sterilization law is essential, lest unwittingly, or otherwise, invidious discriminations are made against groups or types of individuals in violation of the constitutional guaranty of just and equal laws. The guaranty of "equal protection of the laws is a pledge of the protection of equal laws." *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369. When the law lays an unequal hand on those who have committed intrinsically the same quality of offense and sterilizes one and not the other, it has made as invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment. *Yick Wo* v. *Hopkins, supra; Gaines* v. *Canada*, 305 U. S. 337. Sterilization of those who have thrice committed grand larceny, with immunity for those who are embezzlers, is a clear, pointed, unmistakable discrimination. Oklahoma makes no attempt to say that he who commits larceny by trespass or trick or fraud has biologically inheritable traits which he who commits embezzlement lacks. Oklahoma's line between larceny by fraud and embezzlement is determined, as we have noted, "with reference to the time when the

fraudulent intent to convert the property to the taker's own use" arises. *Riley* v. *State, supra,* 64 Okla. Cr. at p. 189, 78 P. 2d p. 715. We have not the slightest basis for inferring that that line has any significance in eugenics, nor that the inheritability of criminal traits follows the neat legal distinctions which the law has marked between those two offenses. In terms of fines and imprisonment, the crimes of larceny and embezzlement rate the same under the Oklahoma code. Only when it comes to sterilization are the pains and penalties of the law different. The equal protection clause would indeed be a formula of empty words if such conspicuously artificial lines could be drawn. See *Smith* v. *Wayne Probate Judge,* 231 Mich. 409, 420–421, 204 N. W. 40. In *Buck* v. *Bell, supra,* the Virginia statute was upheld though it applied only to feeble-minded persons in institutions of the State. But it was pointed out that "so far as the operations enable those who otherwise must be kept confined to be returned to the world, and thus open the asylum to others, the equality aimed at will be more nearly reached." 274 U. S. p. 208. Here there is no such saving feature. Embezzlers are forever free. Those who steal or take in other ways are not. If such a classification were permitted, the technical common law concept of a "trespass" (Bishop, Criminal Law, 9th ed., vol. 1, §§ 566, 567) based on distinctions which are "very largely dependent upon history for explanation" (Holmes, The Common Law, p. 73) could readily become a rule of human genetics.

It is true that the Act has a broad severability clause.[3] But we will not endeavor to determine whether its applica-

---

[3] Sec. 194 provides:

"If any section, sub-section, paragraph, sentence, clause or phrase of this Act shall be declared unconstitutional, or void for any other reason by any court of final jurisdiction, such fact shall not in any manner invalidate or affect any other or the remaining portions of this Act, but

tion would solve the equal protection difficulty. The Supreme Court of Oklahoma sustained the Act without reference to the severability clause. We have therefore a situation where the Act as construed and applied to petitioner is allowed to perpetuate the discrimination which we have found to be fatal. Whether the severability clause would be so applied as to remove this particular constitutional objection is a question which may be more appropriately left for adjudication by the Oklahoma court. *Dorchy* v. *Kansas*, 264 U. S. 286. That is reëmphasized here by our uncertainty as to what excision, if any, would be made as a matter of Oklahoma law. Cf. *Smith* v. *Cahoon*, 283 U. S. 553. It is by no means clear whether, if an excision were made, this particular constitutional difficulty might be solved by enlarging on the one hand or contracting on the other (cf. Mr. Justice Brandeis dissenting, *National Life Ins. Co.* v. *United States*, 277 U. S. 508, 534–535) the class of criminals who might be sterilized.

*Reversed.*

MR. CHIEF JUSTICE STONE, concurring:

I concur in the result, but I am not persuaded that we are aided in reaching it by recourse to the equal protection clause.

If Oklahoma may resort generally to the sterilization of criminals on the assumption that their propensities are transmissible to future generations by inheritance, I seriously doubt that the equal protection clause requires it to apply the measure to all criminals in the first instance, or to none. See *Rosenthal* v. *New York*, 226 U. S. 260, 271;

the same shall continue in full force and effect. The Legislature hereby declares that it would have passed this Act, and each section, subsection, paragraph, sentence, clause or phrase thereof, irrespective of the fact that any one or more other sections, sub-sections, paragraphs, sentences, clauses or phrases be declared unconstitutional."

*Keokee Coke Co.* v. *Taylor,* 234 U. S. 224, 227; *Patsone* v. *Pennsylvania,* 232 U. S. 138, 144.

Moreover, if we must presume that the legislature knows—what science has been unable to ascertain—that the criminal tendencies of any class of habitual offenders are transmissible regardless of the varying mental characteristics of its individuals, I should suppose that we must likewise presume that the legislature, in its wisdom, knows that the criminal tendencies of some classes of offenders are more likely to be transmitted than those of others. And so I think the real question we have to consider is not one of equal protection, but whether the wholesale condemnation of a class to such an invasion of personal liberty, without opportunity to any individual to show that his is not the type of case which would justify resort to it, satisfies the demands of due process.

There are limits to the extent to which the presumption of constitutionality can be pressed, especially where the liberty of the person is concerned (see *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152, n. 4) and where the presumption is resorted to only to dispense with a procedure which the ordinary dictates of prudence would seem to demand for the protection of the individual from arbitrary action. Although petitioner here was given a hearing to ascertain whether sterilization would be detrimental to his health, he was given none to discover whether his criminal tendencies are of an inheritable type. Undoubtedly a state may, after appropriate inquiry, constitutionally interfere with the personal liberty of the individual to prevent the transmission by inheritance of his socially injurious tendencies. *Buck* v. *Bell,* 274 U. S. 200. But until now we have not been called upon to say that it may do so without giving him a hearing and opportunity to challenge the existence as to him of the only facts which could justify so drastic a measure.

Science has found and the law has recognized that there are certain types of mental deficiency associated with delinquency which are inheritable. But the State does not contend—nor can there be any pretense—that either common knowledge or experience, or scientific investigation,[1] has given assurance that the criminal tendencies of any class of habitual offenders are universally or even generally inheritable. In such circumstances, inquiry whether such is the fact in the case of any particular individual cannot rightly be dispensed with. Whether the procedure by which a statute carries its mandate into execution satisfies due process is a matter of judicial cognizance. A law which condemns, without hearing, all the individuals of a class to so harsh a measure as the present because some or even many merit condemnation, is lacking in the first principles of due process. *Morrison* v. *California*, 291 U. S. 82, 90, and cases cited; *Taylor* v. *Georgia*, 315 U. S. 25. And so, while the state may protect itself from the demonstrably inheritable tendencies of the individual which are injurious to society, the most elementary notions of due process would seem to require it to take appropriate steps to safeguard the liberty of the individual by affording him, before he is condemned to an irreparable injury in his person, some opportunity to show that he is without such inheritable tendencies. The state is called on to sacrifice no permissible end when it is required to reach its objective by a reasonable and just procedure adequate to safeguard rights of the individual which concededly the Constitution protects.

---

[1] See Eugenical Sterilization, A Report of the Committee of the American Neurological Association (1936), pp. 150–52; Myerson, Summary of the Report, 1 American Journal of Medical Jurisprudence 253; Popenoe, Sterilization and Criminality, 53 American Bar Assn. Reports 575; Jennings, Eugenics, 5 Encyclopedia of the Social Sciences 617, 620–21; Montagu, The Biologist Looks at Crime, 217 Annals of American Academy of Political and Social Science 46.

[Over]

546

MR. JUSTICE JACKSON concurring:

I join the CHIEF JUSTICE in holding that the hearings provided are too limited in the context of the present Act to afford due process of law. I also agree with the opinion of MR. JUSTICE DOUGLAS that the scheme of classification set forth in the Act denies equal protection of the law. I disagree with the opinion of each in so far as it rejects or minimizes the grounds taken by the other.

Perhaps to employ a broad and loose scheme of classification would be permissible if accompanied by the individual hearings indicated by the CHIEF JUSTICE. On the other hand, narrow classification with reference to the end to be accomplished by the Act might justify limiting individual hearings to the issue whether the individual belonged to a class so defined. Since this Act does not present these questions, I reserve judgment on them.

I also think the present plan to sterilize the individual in pursuit of a eugenic plan to eliminate from the race characteristics that are only vaguely identified and which in our present state of knowledge are uncertain as to transmissibility presents other constitutional questions of gravity. This Court has sustained such an experiment with respect to an imbecile, a person with definite and observable characteristics, where the condition had persisted through three generations and afforded grounds for the belief that it was transmissible and would continue to manifest itself in generations to come. *Buck* v. *Bell*, 274 U. S. 200.

There are limits to the extent to which a legislatively represented majority may conduct biological experiments at the expense of the dignity and personality and natural powers of a minority—even those who have been guilty of what the majority define as crimes. But this Act falls down before reaching this problem, which I mention only to

avoid the implication that such a question may not exist because not discussed. On it I would also reserve judgment.